MICHAEL E. KIRBY, Judge.
hThe Southern Regional Opera Endowment Fund f/k/a New Orleans Opera Association Endowment Fund (hereinafter “Fund”) appeals the granting of Summary Judgment in favor of the New Orleans Opera Association (hereinafter “Opera Association”). This matter dictates that we analyze the cause, as defined by La. Civil Code art. 1967, of the Articles of Incorporation of the Fund.

HISTORY

New Orleans has the longest history of grand opera performance of any city in the United States. The American premiers of some of the greatest French and Italian operas occurred in New Orleans in the 19th Century. In the 1840’s, New Orleans supported three resident opera companies. Between 1860 and 1919, the regular performance of grand opera at the Old French Opera House in the Vieux Carré was a staple of the musical life of the city.
For the past 68 years, Grand Opera has been presented in New Orleans under the aegis of the Opera Association, a non-profit corporation formed in ^February, 1948. Every year the Opera Association has presented public performances of major grand operas featuring nationally and internationally known opera stars, professional sets and costumes, and a full orchestra and chorus. During this period, no other New Orleans based organization undertook this endeavor. The Opera Association also has developed and implemented community and educational outreach activities and has enriched young audiences by inviting student groups, free of charge, to the final dress rehearsals of each opera.
Although Hurricane Katrina forced the cancellation of a portion of the 2005-2006 season, the Opera Association quickly returned with an opera gala at the New Orleans Arena on March 5, 2006 featuring world-renowned tenor Placido Domingo. This gala was attended by nearly 7,000 people, the largest single attendance at an opera performance in New Orleans in the history of the city. Shortly thereafter, the Opera Association resumed regular opera programs and continues to this day.
On September 17, 1990, supporters of the Opera Association incorporated the Fund, a Louisiana non-profit corporation. *793 The Fund’s purpose was to provide a perpetual source of financing for the Opera Association whose full name was incorporated in the name of the Fund. Article 2 of the Fund’s 1990 original articles of incorporation, states:
The purpose of this corporation shall be to support grand opera in New Orleans. In furtherance thereof, this corporation shall provide support exclusively for tax-exempt charitable purposes to the New Orleans Opera Association so long as the New Orleans Opera Association is an organization described in Section | s501 (c)(3) of the federal Internal Revenue Code of 1986, as amended, and in connection therewith, shall consider requests for financial assistance by the executive committee of the New Orleans Opera Association. [Italics added.]
Further confirming the exclusive purpose of the Fund, Article 11 states:
In the event of the dissolution or termination of the corporation, the Liquidator shall, after paying or making provision for the payment of all of the liabilities of the corporation, dispose of all of the assets of the corporation to the New Orleans Opera Association exclusively ... [Italics added.]
The intent of the of the original articles was re-affirmed in the deposition of Mrs. Lois Hawkins, a former president of the Opera Association, whose husband, Lloyd Hawkins, was a founder of the Fund. Mrs. Hawkins has donated generously to the Fund and sits on its Board. Her testimony was the following:
Q. Did you and Lloyd Hawkins ever entertain the idea of supporting opera in any other community than New Orleans through the New Orleans Opera Association?
R. No. * * * *
Q. Was it your intent, to the best of your knowledge your husband’s intent, that the earnings from that corpus or from the principal in that Fund would benefit the New Orleans Opera Association?
R. Oh, very definitely. It would go only to the Association.
Q. * * * ⅜ I quote [from an exhibit]: “... The Fund creates a perpetual source of money assuring the growth and healthy development of the New Orleans Opera Association now and into the future.” Period. End quote. And do you agree with that statement by Mr. Niehaus?
R. Yes, very definitely.
| ¿Prior to 2006, the Charter of the Fund was amended only once, on February 14, 2000. That amendment dealt with provisions for life membership in the Fund, the timing of directors’ meetings, the location and addresses of the registered office and registered agent. Otherwise, the original articles of incorporation remained unchanged prior to 2006.
With its initial contribution supplemented by donations from hundreds of donors to the Fund since 1990, the Fund grew to $3,776,983 as of July 31, 2007. The donations, which both established the Fund and contributed to its growth, were solicited and accepted as the product of joint solicitation efforts and cooperative agreements between the Opera Association and the Fund.
Article 4(1) of the Fund’s articles of incorporation requires the Fund to distribute its income on investments for each taxable year and authorizes distributions of additional amounts. In addition, the Fund is required to distribute any amount required to be distributed under Section 4942 of the Internal Revenue Code. Through calendar year 2005, all distributions were made each year exclusively to the Opera Association as exclusive benefi *794 ciary of the Fund. The amount of the annual distributions during the years 1998 through 2005 ranged between $75,000 and $275,000.
John C. Lovell, Jr., a director on the Fund’s Board, stated in an affidavit that the Fund originally filed for tax-exempt status as a public charity. For public charities, the Internal Revenue Code does not impose a maximum or minimum amount that must be distributed each year. Over time, the Fund was unable to |Bmaintain its status as a public charity due to a lack of donations from the general public. In Mr. Lovell’s opinion the Fund was required to adopt another tax-exempt classification in order to continue its tax-exempt status. In June 2005, the Fund’s Board of Directors concluded that it could best meet its founders’ objectives by becoming a private foundation.
Section 4942 of the Internal Revenue Code requires five per cent (5%) of the average value of a private foundation’s investment assets for the previous year, less administrative costs, to be distributed yearly. The Lovell Affidavit further stated that the Fund’s Board was concerned that these required minimum distributions would force it to significantly invade principal and erode the Fund’s corpus over time. Mr. Lovell stated that preservation of the Fund’s corpus is of paramount concern to the Opera Fund Board.
On February 1, 2006, acting “pursuant to a resolution of all the Members and Directors” of the Fund, the Fund amended and restated its Articles of Incorporation to change, inter alia, the Fund’s name, its purpose, voting rights of members, control of its management and affairs and to remove the Opera Association’s right to receive one hundred percent (100%) of the net assets of the Fund upon its dissolution.
On or about June 29, 2006, the Fund created a “donor designated” fund at the Greater New Orleans Foundation, (“GNOF”) with an establishing gift of $145,000. The fund avers it did this to preserve the corpus of its funds and still | ^comply with the public charity rules of the Internal Revenue Code. The GNOF was created as a Section 501(c)(3) public charity. See 26 U.S.C.A. § 501(c).
The Opera Association argues that under the 26 U.S.C.A. § 4942 rule, as well as Article 4(1) of the Fund’s articles of incorporation, the Fund’s Board was obligated to distribute to it about $220,000 by June 30, 2006. Instead, it argues, the Fund’s Board chose to distribute a meager $75,000 to the Opera Association and diverted the remaining $145,000 to GNOF. The Fund responds to this contention by asserting that the decisions of the Fund’s Board to alter the tax classification and adopt the February and November 2006 amendments all fall within the ambit of the business judgment rule. Salley v. Salley, 95-0387 (La.10/16/95), 661 So.2d 437, 441.
Through cooperative agreements, the Opera Association and the Fund have jointly solicited donations to the Fund. Examples of such agreements are evidenced in newsletters and program books produced by the Opera Association.
In the 1997-98 program, the Fund’s Secretary, Owen Q. Niehaus, stated:
One may ask why such a substantial funding target is needed. Perhaps it is timely to review the purpose of the Endowment Fund. The Fund creates a perpetual source of money assuring the growth and healthy development of the New Orleans Opera Association now and into the future. [Italics supplied.]
In the 2002-03 program, Niehaus stated:
Remember: our purpose is to provide financial back-up to the New Orleans Opera Association if and when critical financial needs arise. We need your sup *795 port and look specifically to being included in your income and estate planning to accomplish this objective.
|7And, in the 2000-01 and 2001-02 programs, Secretary Niehaus stated:
The objective of the New Orleans Opera Association Endowment Fund is to provide additional income to the Opera Association when needed. To achieve this objective, the Fund monitors closely the needs of the Opera Association and if and when financial support is required, the Fund is there to perform its “duty” in accordance with the Fund’s Articles of Incorporation. [Italics supplied.]
Mrs. Hawkins testified that many former Opera Association donors diverted their donations to the Fund after it was created. John C. Lovell, an officer and director of the Fund corroborated her statements. Moreover, Lovell confirmed that he and others solicited donations to the Fund by telling prospective donors that “the income would go to the Association.” The Fund confirmed this in its response to Requests for Admissions.
There were other collaborative and cooperative agreements between the parties. The Opera Association produced tapes and compact disks (“CD”) of notable performances from the Opera Association’s archives. In each instance, these Opera Association-produced recordings prominently stated that a portion of the proceeds from the sale of the CD would be invested in the Fund to secure the future of opera in New Orleans.
Additionally, the Fund used the mailing address of the Opera Association as its own until 2005. During that time, the only office of the Fund was located in space leased by the Opera Association which the Fund used rent-free. For many years, the Fund and the Opera Association shared common directors.
|sWe find the evidence supports the conclusion that the exclusive purpose of the Fund, or the cause[1], for its incorporation was to solicit and receive donations to build an endowment for the exclusive benefit of the Opera Association.
On February 1, 2006, the Board of Directors of the Fund executed amendments to their original Articles of Incorporation. These amendments eliminated the language that the Fund’s exclusive purpose was to make financial distributions to the Opera Association, and vested control of the Fund in a select small group. The Opera Association was not given notice of, or an opportunity to vote on, the amendments.
The first major change was that the Fund’s name was changed to “Southern Regional Opera Endowment Fund.” The next major change was to Article 2 to delete the Opera Association as the exclusive beneficiary of the Fund, which was restated as follows:
This corporation is organized exclusively for charitable or educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provision of any future federal tax code; the “Code”), including, for such purposes, the making of distributions to organizations that qualify as tax exempt organizations under Section 501(c)(3) of the Code. Specifically, such charitable purposes include supporting grand opera in the southern region of the United States by providing financial assistance to organizations that would further this purpose and that qualify as exempt organizations under Section 501(e)(3) of the Code. [Emphasis added.]
*796 Further, an amendment to Article 11 provided that, upon dissolution of the Fund instead of the Opera Association, the assets of the Fund would be distributed |flto any “qualified charities ... that conduct charitable activities that would further the purpose of supporting grand opera in the southern region of the United States.... ”
The third major change was that the members of the Fund would thenceforth be elected by a majority of the then serving Board of Directors. Thus, the current Fund Board would control its own makeup and, thereby, all of the Fund’s decision making.
On October 31, 2006, the Opera Association alleges that it notified the Fund that this lawsuit would be filed. The following day, the Fund re-amended its Articles to revoke some of the February 1, 2006 amendments. The first change renamed the Fund from “Southern Regional Opera Endowment Fund” to “New Orleans Opera Endowment Fund.” The second change was yet another alteration of the purpose of the Fund from “supporting grand opera in the southern region of the United States,” to “charitable or educational purposes ... [which] include supporting grand opera in New Orleans.” While the November amendment did not eliminate the Opera Association as the Fund’s exclusive beneficiary, as did the February 1, 2006 amendment, it certainly watered down the original provision governing the purpose of the Fund. Throughout these corporate law maneuvers, the Fund asserts that its only motive was to protect its principal and to benefit the Opera Association.

[inACTION OF THE TRIAL COURT

In its Judgment dated September 17, 2007, the trial court ruled in favor of the Opera Association and specifically: declared null and void the amendments of February 1, 2006 and November 1, 2006; ordered the Fund to perform its third party stipulations in favor of the Opera Association; prohibited disbursement of funds to any organization other than the Opera Association with an exception for payment of ordinary and reasonable expenses of administration; and awarded a money judgment against the Fund in the amount of $145,000.

DISCUSSION

The issue before us is a classic example of the problem between form versus substance. The resolution of this matter depends upon the characterization of what is the raison d’etre of the contract that created the Fund in question. The Fund argues that corporate law principles should apply, while the Opera Association argues basic contract and obligations law apply. Because we agree with the legal characterization adopted by the trial court and Opera Association, we conclude that the main issue presented for review is whether the directors of the Fund have the legal right to amend the Fund’s 1990 articles of incorporation to eliminate the stipulation pour autrui in favor of the Opera Association without its consent.
The Civil Code is the progeny of Aristotelian teleological[2] thought, which attempts to explain the world through order and purpose. The civil law is an a 1 ^priori, rationalistic system that seeks to establish a set outcome, so as to reduce uncertainty. This goal of establishing a set outcome fosters enterprise because in *797 theory one can determine beforehand the consequences of a given action or decision, such as donating money for a purpose. Thus, Louisiana Civil Code Book III Of the Different Modes of Acquiring the Ownership of Things, Title IV Conventional Obligations or Contracts, is the source for the applicable law in order to resolve this dispute.
Specifically, we find the following four (4) parts of our Civil Code to be relevant and controlling: Section 4, entitled “Lesion”; Chapter 7, entitled “Third Party Beneficiary”; Chapter 8, entitled “Effects of Conventional Obligations”; and Chapter 13, entitled “Interpretation of Contracts.”
In this dispute, La. C.C. art. 2045 guides us by stating we must determine the common intent of the parties. See also Parish of Jefferson v. LaFreniere Park Foundation, 98-146, 98-147 (La.App. 5 Cir. 07/28/98), 716 So.2d 472. Comment (c) to La. C.C. art. 2045 teaches that it is not so much the words of the contract that are used to express the parties’ intent, as it is the intent of the parties to the contract, that should drive the interpretation of the words used in the contract.[3] Hence, the importance of the history of how and for what purpose donations to the Fund were collected.
The difficulty of ascertaining the common intent of the parties in this case is complicated by the fact that the two parties are juridical persons that cannot form h ¿their own intent. Their purpose must be ascertained from the collective will of the natural persons that create them. We cited the statements of Mrs. Lois Hawkins, Mr. John C. Lovell, Jr., and Mr. Owen Q. Niehaus, supra, as evidence of the intent of those who created the Fund.
While the Fund would have us focus exclusively on Article 11 of the Charter which grants the Board of Directors the power to amend, that power to amend cannot be viewed in a vacuum. It is not free of any circumscription, as evidenced by the grant of rights to the Opera Association upon dissolution in Article 11 and the purpose statement in Article 2. We find the Fund’s focus here to be misdirected. Ultimately, we are called upon to determine why patrons of the Opera donated to the Fund and to interpret the Fund’s Charter/Articles of Incorporation in effect at the time of the donations. Under our Civil Law, this is articulated as a search for the cause of the obligation, defined in La. C.C. art. 1967.
Joseph v. Hospital Serv. Dist. No. 2, 05-2364, p. 8 (La.10/15/06), 939 So.2d 1206, 1212, holds that whether a third party beneficiary contract exists is decided on a case-by-case basis. Moreover, Trustees of Dartmouth College v. Woodward, 17 U.S. 518, 4 L.Ed. 629 (1819) teaches that the charter of a non-profit charitable corporation is first and foremost a contract, not an instrument subject to an unconstrained right of amendment. In Dolhonde v. Tangipahoa Bank & Trust Co., 153 So. 71, 73 (La.App. 1 Cir.1934), our brethren refer to a corporate charter as the corporation’s “supreme law.” A corporate charter or articles of incorporation are a contract between the corporation and its shareholders and forms a contractual | ^relationship between the shareholders themselves, which sets forth rights, obligations and liabilities. Fletcher, Cyclopedia of Corporations, Vol. 7A, § 3634, pp. 219-221 (Thomson/West 2006). Louisiana has always viewed a corporate charter as contractual in nature. Stark v. Burke, Watt & Co., 9 La.Ann. 341 *798 (1854); Brennan’s House of Printing, Inc. v. Brennan, 05-647, 05-648 (La.App. 5 Cir. 2/27/06), 924 So.2d 1067, 1072; Odenwald v. Bewajobe Corp., 02-0091, p. 4 (La.App. 4 Cir. 7/24/02), 824 So.2d 494, 496. A corporation is in law a “contractual creature, a ‘nexus of contracts.’ ” Bebchuk, Limiting Contractual Freedom in Corporate Law: The Desirable Constraints on Charter Amendments, 102 Harv.L.Rev. 1820, 1821 (1989).
La. C.C. art. 1978, entitled Stipulation for a third party states:
A contracting party may stipulate a benefit for a third person called a third party beneficiary.
Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary’s agreement.
Comment (b) of this Article states that the beneficiary’s intention to accept the benefit may be made known in any manner, even implied. We find evidence in the record that the Fund worked directly with the Opera Association for fifteen years to solicit donations to the Fund for the financial support of the Opera Association exclusively. This manifested the Association’s intent to avail itself of the benefit of the stipulation pour autrui e.g. by accepting monetary contributions from the |uFund. In this way, the third party beneficiary rights were triggered by operation of La. C.C. art. 1978.
La. C.C. art. 1979, entitled Revocation, in the context of third party beneficiary rights, in pertinent part states:
The stipulation may be revoked only by the stipulator and only before the third party has manifested his intention of availing himself of the benefit.
The record is absolutely devoid of any evidence that the Opera Association consented to revocation of its third party rights.[4] Moreover, the advent of this litigation clearly suggests the contrary.
We find, as the trial court did, that the February 1, 2006 Amendments eliminated the third party beneficiary rights of the Opera Association. Likewise, the November 1, 2006 Amendments modified them unacceptably because they lessened the Association’s original third party beneficiary rights. Both sets of Amendments are equivalent to a dissolution/revocation or breach of contract. Thus, La. C.C. art. 1981 confers a right upon the Opera Association, as third party beneficiary, to demand performance. In this case, performance is equivalent to defending its standing as “exclusive” beneficiary.
Applying these principles and our Civil Code, we find that the trial court was correct in finding that the Original Articles of Incorporation of the Fund created a stipulation pour autrui. La. C.C. art. 1978. To reiterate, Article 2 of the original 1990 Articles of Incorporation states:
I ifiThe purpose of this corporation shall be to support grand opera in New Orleans. In furtherance thereof, this corporation shall provide support exclusively for tax-exempt charitable purposes to the New Orleans Opera Association so long as the New Orleans Opera Association is an organization described in Section 501(c)(3) of the federal Internal Revenue Code of 1986, as amended, and in connection therewith, shall consider requests for financial assistance by the *799 executive committee of the New Orleans Opera Association. [Italics added.]
In addition, Article 11 creates exclusive third party beneficiary dissolution rights in favor of the Opera Association. A proper reading of these Articles and the surrounding history reveals that the reason why contributors donated to the Fund was to exclusively benefit the New Orleans Opera Association, of which they were patrons. For the Board to use corporate and procedural law to justify financing opera elsewhere frustrates the true cause, motive or purpose of the Fund. It simply eviscerates the raison d’etre of the Fund — the exclusive benefit of the Opera Association. This contravenes basic tenets of the law of obligations. We conclude that, because the Opera Association’s third party beneficiary rights were breached, the trial court was correct to declare the challenged amendments invalid, as well as award the $145,000 that had been diverted from the Opera Association.
Because we find that La. C.C. art. 1978 and the 1990 Articles of Incorporation of the Fund confer third party beneficiary rights and provide sufficient basis for the trial court judgment, we need not address whether statutory membership rights exist.
Appellant complains that the language in the trial court injunction enjoining its “(c) from acting in any manner which is inconsistent with the original Articles 11fiof Incorporation of the New Orleans Opera Association Endowment Fund dated September 17, 1990 as amended on February 14, 2000” forces it to forever return to its 1990 Articles of Incorporation, as amended. Specifically it objects to a perceived prohibition on amendments pertaining to internal governance of the Fund.
We do not read this provision to ban amendments pertaining to internal governance. If it did, the trial court would have specifically stricken the amendments of February 14, 2000. Properly construed the language simply prohibits the Fund from altering the exclusive third party beneficiary status of the Opera Association.
For the aforementioned reasons, we affirm the decision below.
AFFIRMED.
MCKAY, J., concurs.

. See La. Civil Code art. 1967.

. See La. C.C. art. 1967, Comment (b), which defines the doctrine on cause in terms of end or goal.

. We note that La. C.C. art. 2047, entitled the "Meaning of Words”, can be at tension with Art.2045, as Comment (c) of Art. 2047 notes, Art. 2047 has a common law origin and has no corollary in the earlier civil codes.

. We note that there exists a statutory exception to this general rule pertaining to life insurance. La. C.C. art. 1979, Comment (c).